# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TIMOTHY O'BRIEN, et al., | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 14-cv-7229 |
| CATERPILLAR, INC., | ) |
| Defendant. | ) Judge Sharon Johnson Coleman |

## MEMORANDUM OPINION AND ORDER

Plaintiffs' First Amended Complaint alleges discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §621 et seq. ("ADEA") against defendant Caterpillar, Inc. ("Caterpillar") and on behalf of a purported class of similarly situated individuals. Plaintiffs move for partial summary judgment in their favor [58], claiming the undisputed facts demonstrate that Caterpillar's Supplemental Unemployment Benefit ("SUB") Plan liquidation program caused a significant disparate impact on older workers. Caterpillar moves for summary judgment in its favor [61], arguing the undisputed facts demonstrate that plaintiffs cannot establish disparate impact and Caterpillar based its decision on a reasonable factor other than age. For the reasons stated below, this Court denies summary judgment for plaintiffs and grants summary judgment for Caterpillar.

**Background**

The following facts are undisputed for purposes of deciding this motion. Caterpillar is a Delaware corporation with headquarters in Peoria, Illinois. (Dkt. 65, Pls.'s Resp. to Def.'s L.R. 56.1 Statement of Facts, at ¶1). Caterpillar has several manufacturing locations, including one in Joliet, Illinois. *Id.* Plaintiffs are 48 current employees or the estates of deceased former employees of

1

Caterpillar's Joliet plant. *Id.* at ¶2. Since 1951, Joliet production and maintenance employees, including plaintiffs, have been represented for collective bargaining purposes by the International Association of Machinists and Aerospace Workers, AFL-CIO and its affiliated Local Lodge No. 851 (collectively "IAM" or "the Union"). *Id.* at ¶4. Caterpillar negotiates with the Union concerning terms and conditions of employment because the Union is the exclusive bargaining representative for the Joliet employees. *Id.* at ¶5. Caterpillar and the Union have negotiated a series of collective bargaining agreements covering the Joliet bargaining unit employees. These agreements typically have consisted of a main labor contract and separate contracts covering benefits. *Id.* at ¶6. The bargaining unit (Local Lodge) must ratify any agreement reached between the Union and Caterpillar. *Id.* at ¶7.

Since the 1950s, the Joliet labor contract included a pension plan and, until 2012, it included a Supplemental Unemployment Benefit ("SUB") plan. *Id.* at ¶9-10. The SUB plan provided supplemental compensation to eligible employees who were laid off. *Id.* In March 2012, Caterpillar and the Union began renegotiating the collective bargaining agreement ("CBA") that had been in effect from May 2, 2005, to May 1, 2012 ("the 2005 CBA"). *Id.* at ¶18. One of Caterpillar's objectives in the renegotiation was to eliminate the Joliet SUB plan. *Id.*

The 2005 CBA contained a "New Hire Competitive Base Rate Schedule," applicable to employees hired after May 2, 2005, which provided a compensation package significantly lower than that provided to employees hired before May 2, 2005. *Id.* at ¶11. Under this CBA the cost difference between a new hire employee and a standard wage employee, including differentials in wages and benefits, was approximately $18.00 per hour worked. *Id.* The pension plan in the 2005 CBA applied to Joliet bargaining unit employees hired before May 2, 2005. Covered employees became retirement-eligible by meeting one of the following four criteria: (a) the employee reached age 65 with 5 or more years of credited service, including at least one hour of credited service on or after

December 1, 1989; (b) the employee reached age 60 with 10 or more years of credited service; (c) the employee reached age 55 and his/her age plus years of credited service totaled at least 85; or (d) the employee at any age accumulated 30 or more years of credited service. *Id.* at ¶13; Dkt. 67, Def.'s Resp. to Pl.'s LR 56.1 Statement of Facts at ¶9. Because the pension plan provided that an employee could become retirement-eligible by accumulating 30 or more years of credited service, regardless of age, there were retirement-eligible employees in the Joliet bargaining unit who were younger than certain of their non-retirement-eligible co-workers. Dkt. 65 at ¶14.

The 2005 CBA limited SUB plan participation to Joliet bargaining unit employees who were hired before 1999. *Id.* at ¶15. The Union and Caterpillar agreed during negotiations in 1999 to limit the SUB. *Id.* All Joliet bargaining unit employees who were SUB participants were also pension plan participants. *Id.* Caterpillar made contributions to the SUB through a trust based on hours worked by SUB participants each month. *Id.* at ¶16. The specific amount of the SUB benefit depended on the funded status of the plan at the time the payments were made. *Id.* SUB payments were made during periods of layoff and thus were infrequent. *Id.* at 17. Between 1998 and 2012, there were only four years when more than 20 SUB participants received any payment. *Id.* The average individual monthly SUB payment was $483 and the average total amount of benefits received was $1,890. *Id.*

By 2012 when Caterpillar and the Union began renegotiating the 2005 CBA, Caterpillar wanted to eliminate the SUB in Joliet for several reasons. *Id.* at ¶19. The SUB administration system was aged and required investment to update, and the SUB "tied up" money in the fund that could be used for other purposes. *Id.* Caterpillar also wanted to use the accumulated SUB funds to incentivize retirements among retirement-eligible employees, so their positions could be filled by newly-hired employees who would be subject to the lower "new hire" compensation package. *Id.* at ¶20. The 2012 negotiations was not the first time that Caterpillar had proposed eliminating the SUB plan. *Id.*

at ¶21. It was the first time that Caterpillar proposed using funds liquidated from the SUB plan for an incentive retirement program. Dkt. 67 at ¶19.

On April 5, 2012, Caterpillar made its first contract proposal to the Union. Dkt. 65 at ¶22. The proposal included the elimination of the SUB and the pro rata distribution of the accumulated SUB funds as a retirement incentive for retirement-eligible SUB participants who retired before the end of 2012 pursuant to a "metering" chart, which was intended to regulate departures to avoid operation disruptions. *Id.* The Union rejected Caterpillar's first SUB proposal. *Id.* at ¶23. Caterpillar presented a second proposal on April 24, 2012. *Id.* at ¶24. The Union rejected Caterpillar's second SUB proposal, stating that it was not interested in eliminating the SUB. *Id.* at ¶25. During further negotiations, Caterpillar told the Union that it believed it could not include non-SUB participants in the SUB distribution because the SUB plan provided that the accumulated funds could only be used for the benefit of the participants. *Id.* at ¶26. The Union rejected additional proposals from Caterpillar because it did not want to eliminate the SUB plan. *Id.* at ¶27.

On May 1, 2012, the 2005 CBA expired without an agreement between Caterpillar and the Union and the Union went on strike. *Id.* at ¶28. On May 17, June 27, August 14, 2012, the parties met with a federal mediator. *Id.* at ¶29-31. The parties reached a tentative agreement on August 14, 2012. *Id.* at ¶31. The Union presented the tentative agreement to the Joliet bargaining unit for a ratification vote, which passed. *Id.* at ¶33.

The new agreement provided for termination of the SUB plan as of August 20, 2012. *Id.* at ¶34. Caterpillar would distribute the SUB fund assets in equal shares to two groups: (1) SUB participants who were retirement-eligible under the pension plan and who voluntarily retired between October 1, 2012, and January 1, 2013; and (2) SUB participants who were not eligible to retire under the pension plan but who remained employed and were participants in the 401(k) tax deferred retirement plan as of January 1, 2013. *Id.* The first group received their distributions

directly. The second group received their distribution through a one-time contribution to their 401(k) accounts. *Id.* at ¶36. Retirement-eligible SUB participants were given the option to retire, it was not mandatory. *Id.* at ¶35.

Caterpillar never proposed an individual's age as the criterion for receipt of SUB funds. Caterpillar's position was always that it wanted to use the distribution of SUB funds as an incentive for retirement-eligible employees to retire, which would allow Caterpillar to realize cost savings by hiring replacement employees at the lower, second-tier compensation package. *Id.* at ¶39. Caterpillar did not calculate the savings that would result. Dkt. 67 at ¶23. Distribution of the SUB funds allowed Caterpillar to incentivize retirement without spending any money since Caterpillar had already contributed the funds. *Id.* Caterpillar agreed to distribute SUB funds to non-retirement eligible employees in order to reach an agreement with the Union. Dkt. 65 at ¶40. Caterpillar knew this proposal would dilute the incentive for retirement-eligible participants to retire because it would add over 80 people to the pool that would share the funds. Dkt. 67 at ¶35. Under Caterpillar's original proposal if every retirement-eligible employee retired, then each would receive $38,000. Under the proposal that was ultimately ratified, each participant would receive approximately $28,000. *Id.*

After the Joliet bargaining unit ratified the new labor agreement, Caterpillar distributed the $7.8 million in SUB plan funds in two stages. Dkt. 65 at ¶42. The retirement-eligible participants who opted to retire between October 1, 2012, and January 1, 2013, received the first wave of payments of $28,800 each upon their retirement. *Id.* On January 1, 2013, Caterpillar determined the full pro rata distribution amount based on the actual number of SUB participants who elected to retire and receive a SUB distribution. Caterpillar then distributed the balance of their full share of $37,836.51, first to the retired SUB plan participants, followed by a one-time disbursement of the

full $37,836.51 to the 401(k) accounts of the non-retirement eligible SUB plan participants. *Id.* at ¶43.

At the beginning of negotiations in March 2012, Caterpillar had 796 employees in the Joliet bargaining unit. *Id.* at ¶46.

|  | Total Number | Age Range | Average Age |
|---|---|---|---|
| SUB Participants | 291 | 35-82 | 56.2 |
| Non-SUB Participants | 505 | 18-75 | 41.1 |

*Id.* at ¶47. Of the 291 SUB participants in March 2012, only 269 remained by September 2012 due to retirements and one termination. *Id.* at ¶¶48-49.

|  | Total Number/ Number age 40 + | Average Age |
|---|---|---|
| Retirement-eligible | 184/84 | 61.57 |
| Non-retirement-eligible | 85/80 | 47.81 |

*Id.* at ¶49. For the 184 retirement-eligible participants, 166 were eligible for retirement based on the "more than 30-years of service regardless of age" provision of the labor agreement. *Id.* at ¶50.

Plaintiffs are 48 retirement-eligible SUB participants who chose not to retire and, therefore, did not receive a share of the SUB funds. *Id.* at ¶51. Plaintiffs, who have not retired or passed away since the filing of this lawsuit, remain employed with Caterpillar and earn wages and benefits. *Id.* at ¶52. Plaintiffs claim that the memorandum of understanding that contained the SUB plan distribution provision of the 2012 CBA had a disparate impact on older participants.

In support of their claim, plaintiffs retained Whitman Soule, who provided an Amended Expert Report analyzing the ages and retirement-eligibility status of the 269 SUB plan participants. *Id.* at ¶54. Mr. Soule employed two ways of assessing the magnitude and significance of the difference in age distributions of the retirement-eligible and non-retirement eligible employees in this population. First, he compared the average ages of the two groups and found the mean age on January 1, 2013, of retirement-eligible SUB participants to be 61.57 years, and the corresponding

6

mean age of non-retirement-eligible SUB participants to be 47.81 years. *Id.* at ¶55. Second, Mr. Soule also performed a tabular analysis, using ages 45 to 69, in which he compared the number and percentage of employees above and below a particular age who were, and were not retirement-eligible. *Id.* at ¶56. Based on both tests, Mr. Soule opined that "the retirement eligible employees are substantially and significantly older than the employees who were not eligible for retirement. Conversely, older employees were significantly more likely than younger employees to be eligible for retirement." *Id.* at ¶57.

Mr. Soule further opined that "there is a very strong relationship between age and retirement eligibility" among the SUB participants. He admitted that this correlation existed prior to the events at issue. *Id.* Mr. Soule did not analyze or offer any opinion concerning the comparative ages of SUB participants who did, and who did not, receive a distribution from the SUB plan disbursement. *Id.* at ¶58. Mr. Soule found that there were no retirement-eligible employees younger than 54 and there were no non-retirement-eligible employees older than 59. Dkt. 67 at ¶55. Mr. Soule's Amended Report indicates that only one (1.4%) of the 73 employees under the age of 55 were eligible for retirement, while 183 (93.4%) of the employees 55 and older were eligible for retirement. *Id.* at ¶57. Based on those numbers, Mr. Soule concluded that employees 55 and older were about 68 times (93.4%/1.4%) as likely to be eligible for retirement. *Id.*

Caterpillar retained a statistical expert to rebut Mr. Soule's opinions.[1] Dr. Jon Guryan reviewed Mr. Soule's Amended Report and the 31 sets of statistical tests and found them to be unnecessary because the relationship between age and retirement eligibility is defined in paragraphs (a) and (b) of subsection 4.1 of the Supplemental Agreement Relating to Non-Contributory Pension

---

[1] Caterpillar's expert challenges Mr. Soule's qualifications as an expert based on the methodology he used. Plaintiffs likewise take issue with Dr. Guryan's use of counterfactuals. Neither party filed a separate *Daubert* motion. The issues raised by each party are more relevant to credibility and the weight to be given the testimony than actual qualification.

7

Plan dated August 17, 2012.² Dkt. 65 at ¶59. Under the pension plan, retirement-eligibility is conferred by one of four possible scenarios, three of which depend explicitly on age and the fourth depends on years of service, which is correlated with age. *Id.* at ¶60. Dr. Guryan opined that "[i]t is unsurprising that the significance between age and retirement eligibility increases as age increases, but still irrelevant to the matter at hand, which is the distribution of the SUB fund. In fact, the relationship between age and retirement eligibility predates the distribution of the SUB fund, *i.e.*, it existed before the SUB fund was liquidated." *Id.*

Dr. Guryan also performed an independent analysis of the SUB population in which he used the same statistical methodology as Mr. Soule to assess the statistical significance of the relationship between age and the receipt of the distributed SUB funds. Dr. Guryan determined that of the 269 SUB participants who were potentially eligible for a disbursement, 264 were 40 or older. Dr. Guryan further determined that 97.6% of the individuals who received a SUB distribution were age 40 or older. *Id.* at ¶61. Based on these findings, Dr. Guryan concluded that "there is no difference between the statistical distribution of employees receiving SUB funds and not receiving SUB funds based on their protected age category [age 40 and older]. *Id.* at ¶62. He further concluded that "there is not evidence to support the argument that there is a disparity based on the ADEA-defined age cutoff in who received a SUB fund distribution." *Id.* at ¶63. Dr. Guryan only analyzed the impact on employees under and over 40. Dkt. 67 at ¶63.

Dr. Guryan identified two "counterfactual" scenarios that he deemed appropriate in this case to determine whether there was a statistically-significant disparate impact in favor of persons under 40 compared to persons 40 and over. *Id.* at ¶69. Guryan's first hypothetical scenario posited that Caterpillar would have distributed the liquidated SUB fund in equal shares to all of the 796

---

² The Supplemental Agreement Relating to Non-Contributory Pension Plan dated August 17, 2012, is elsewhere referred to as the memorandum of understanding regarding the SUB plan disbursement. Put another way, it is the provision agreed to in the 2012 CBA that governs liquidation of the SUB funds.

employees in the bargaining unit. *Id.* at ¶70. Dr. Guryan was unaware that Caterpillar never proposed disbursing the funds to all employees in the bargaining unit. *Id.* at ¶71. He then compared this situation to the actual one. He took the eight employees under 40 (as of February 2012) who actually received a distribution in the real-world situation under the eligibility rules applicable to that situation and calculated that those eight persons formed only 3.3% of the 236 employees in the entire Joliet bargaining unit who were under 40. *Id.* at ¶74. He took the 199 persons 40 or over (as of February 2012) who actually received a distribution in the real-world situation and calculated that these 199 persons formed 35.5% of the 560 Joliet bargaining unit employees 40 or over. *Id.* He then concluded that "older workers are much more likely to receive a distribution from the SUB fund than younger workers when the entire bargaining unit is taken into consideration." *Id.* He further concluded that, "[c]ompared to [the first] counterfactual, in which the money in the SUB fund would have been split among all members of the Joliet bargaining unit, the impact of the final decision to limit the distribution to SUB-eligible members, even with the stipulation that retirement-eligible employees retire to receive the money, was favorable to older workers." *Id.*

The second counterfactual that Dr. Guryan considered was that Caterpillar would have left the SUB plan in place. *Id.* at ¶75. He concluded that "in comparison with the counterfactual scenario in which the SUB plan would not have been liquidated, it is likely that the decision to liquidate the SUB fund was beneficial to 40-and-over SUB-eligible employees relative to under-40 SUB eligible workers." *Id.*

**Legal Standard**

Summary judgment is proper when "the admissible evidence shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."*McGreal v. Vill. of Orland Park*, 850 F.3d 308, 312 (7th Cir. 2017), *reh'g denied* (Mar. 27, 2017) (quoting *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 791 (7th Cir. 2014)); Fed. R. Civ. P. 56(a). In

9

deciding whether summary judgment is appropriate, this Court accepts the nonmoving party's evidence as true and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

**Discussion**

The ADEA makes it unlawful for an employer to discharge an employee "because of such individual's age." 29 U.S.C. § 623(a)(1); *see Ripberger v. Corizon, Inc.*, 773 F.3d 871, 880 (7th Cir. 2014). ADEA protection extends to individuals who are 40 years of age or older. 29 U.S.C. § 631(a). In *Smith v. City of Jackson*, the Supreme Court recognized disparate-impact theory of age discrimination under the ADEA, but held that "the scope of disparate-impact liability under ADEA is narrower than under Title VII." 544 U.S. 228, 240 (2005). Disparate impact claims "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). Such claims do not require proof that the employer had a discriminatory motive in adopting the challenged employment practice. *Id.*

"It is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such impact. Rather, the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" *Smith,* 544 U.S. at 241 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656, 109 S. Ct. 2115, 2124, 104 L. Ed. 2d 733 (1989); emphasis added). Plaintiffs must offer statistical evidence demonstrating that the employment practice at issue adversely impacted plaintiffs because of their age. *See Id.*

Here, the undisputed facts demonstrate that plaintiffs cannot establish a prima facie case of disparate impact discrimination. First, plaintiffs do not point to a specific employment practice or policy. Although plaintiffs assert that Caterpillar's SUB liquidation plan resulted in a significant

10

disparate impact on older workers, that plan fails to satisfy the specific employment practice requirement because it is the culmination of several elements unrelated to age. The CBA defined which members of the bargaining unit could participate in the SUB plan, which was unrelated to age. The pension plan also contained in the CBA defined retirement eligibility based on four scenarios, none that relied solely on age. Thus, there is no isolated employment practice. Instead, plaintiffs are complaining of the cumulative effect of several agreements. The SUB plan liquidation itself would be a single decision or event that also would not qualify as an employment policy. *See Sneed v. Strayer University,* No. 1:15-cv-0004, 2016 WL 1023311 (E.D. Va. Mar. 8, 2016) (finding that plaintiff had not established disparate impact age discrimination based on the closing of a facility and the termination of employment, which was a single event). The district court in *Sneed* relied on the Supreme Court's decision in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, reasoning that "causation is particularly difficult in cases where the plaintiff's complaint stems from a defendant's 'one-time' decision because 'one-time decision[s] may not be [discriminatory] policy at all.'" *Sneed,* 2016 WL 1023311 at *10 (quoting *Texas Dep't of Hous. & Cmty. Affairs,* 135 S.Ct. 2507, 2524, 192 L.Ed.2d 514 (2015)). Sneed failed to present evidence that Strayer University's decision to close one branch represented a common practice or something that Stayer had done before, and thus the court granted summary judgment in favor of the defendant. *Id.* at *10.

Despite plaintiffs' attempt to show statistical disparity based on age, as Caterpillar points out the correlation between age and retirement-eligibility is definitional. Plaintiffs paint the SUB plan requirement that employment eligible participants choose to retire in order to receive a share of the funds as an "unlawful choice." They compare the situation here, with the one in *Solon v. Gary Community Sch. Corp.*, 180 F.3d 844 (7th Cir. 1999). Plaintiffs' reliance on *Solon* is misplaced. There, the court held that the school district's early retirement plan was discriminatory on its face because the amount of benefits varied depending on the retiree's age and nothing else. *Id.* at 853. The

11

"unlawful choice" that the court referred to in *Solon* was unlawful because it was defined solely by age. "Employees are offered incentives to retire sooner than they otherwise plan, but 'early' retirement is defined exclusively in terms of age. Yet one's ability to retire is typically dependent on a host of factors other than age: one's years of service with the employer (which will typically affect pension benefits), savings, dependents, health, and so on." *Id.*

Here, the choice is defined not by age but by retirement eligibility. Plaintiffs concede as much, stating that the memorandum of understanding containing the SUB plan liquidation scheme "used retirement eligibility to determine who had to give up their jobs to share in the SUB funds." Dkt. 69, Pls' Reply at p. 3. The decision to retire and partake in the SUB plan liquidation, rather than forego the disbursement and keep working determined not by age, but by the "host of other factors" that the court in *Solon* described. Moreover, plaintiffs' statistical model does not work to show discrimination because non-retirement eligible SUB plan participants are not similarly situated for comparison purposes because they are by definition disqualified from retirement. *See Wards Cove*, 490 U.S. at 651-52 (holding that statistical evidence showing high percentage of non-white workers in the employer's cannery jobs and low percentage of such workers in non-cannery positions did not establish *prima facie* case of disparate impact). Thus, plaintiffs fail to establish a *prima facie* case of disparate impact age discrimination.[3]

Even if plaintiffs could meet their burden, an employer can affirmatively defend against a disparate impact claim by showing that the provision or policy is based on a reasonable factor other than age. *Meacham v. Knolls Atomic Power Lab*, 554 U.S. 84, 96, 128 S.Ct. 2395 (2008). The defense functions not by justifying age discrimination but, instead, by negating the premise that the

---

[3] Plaintiffs' motion to cite additional authority [74] is granted. However, *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61 (3d Cir. 2017), does not alter the analysis here. In *Karlo*, the Third Circuit Court of Appeals held that ADEA disparate impact claims are not limited to 40-and-older comparisons, and can be based on subgroup, creating a split among the circuits on the issue (the Seventh Circuit has not ruled). Even if this Court allowed plaintiffs to define the protected group as a sub-group over 55 years of age, the other issues undermining plaintiffs' *prima facie* case remain the same.

employment practice is "because of… age." *Id.* at 93. Caterpillar asserts that the decision to use SUB plan funds as a retirement incentive to make new hires at a lower compensation rate is a reasonable factor other than age.

> The focus of the defense is that the factor relied upon a 'reasonable' one for the employer to be using. Reasonableness is a justification categorically distinct from the factual condition 'because of age and not necessarily correlated with it in any particular way: a reasonable factor may lean more heavily on older workers, as against younger ones, and an unreasonable factor might do just the opposite.

*Id.*

Caterpillar contends the purpose of the SUB plan distribution was to incentivize retirement for those employees eligible to retire in order for Caterpillar to hire new employees at the lower compensation tier. It is undisputed that the lower compensation package had a cost difference between new hire employees and standard wage employees was approximately $18.00 per hour worked. Moreover, Caterpillar contends and plaintiffs do not dispute that there were other reasons Caterpillar wanted to eliminate the SUB plan. The administration was outdated and would require investment to update, and the infrequent need for disbursement of SUB funds under the plan due to layoffs, the fund held capital that Caterpillar could use for other purposes. All these factors seem reasonable factors for Caterpillar to reduce costs. Accordingly, the use of the SUB plan funds to incentivize retirement for retirement-eligible SUB plan participants is a reasonable factor other than age for the disbursement of the SUB plan fund, negating the premise that the employment practice is "because of… age".

**Conclusion**

Based on the foregoing discussion, this Court grants summary judgment in favor of defendant Caterpillar and denies summary judgment for plaintiffs. Civil case terminated.

IT IS SO ORDERED.

Date: 8/31/17

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge